UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| LIBERTY MEDIA HOLDINGS, LLC<br><br>Plaintiff,<br><br>vs.<br><br>HAWAII MEMBERS OF SWARM OF NOVEMBER 15, 2010 TO JANUARY 27, 2011, SHARING HASH FILE AE340D0560129AFEE8D78CE07F2394C7B5BC9C05; MICHAELA HATANAKA, BRAD HATCHER, BRUCE GREEK, AND DOES 13 THROUGH 20,<br><br>Defendants. | Case No. 1:11-cv-00262 DAE-RLP (Copyright)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT MICHAELA HATANAKA** |

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ...................................................................................v

I. THE DEFAULT JUDGMENT SOUGHT AGAINST DEFENDANT MICHAELA HATANAKA IS APPROPRIATE ...............................................1

    A. The Court has Jurisdiction over the Subject Matter and over the Defendant and Venue is Appropriate in this District ....................................................1

    B. The Facts of Record Show That a Default Judgment is Warranted..............1

    C. The Specific Relief Sought by Plaintiff Is Factually Supported and Authorized by Law........................................................................................2

        1. Hatanaka Pirated Plaintiff's Works for Commercial Gain .......................2

        2. Statutory Damages Are Authorized .........................................................4

        3. Use of BitTorrent shows Willfulness........................................................6

        4. $25,000 in Statutory Damages Should Be Awarded In This Case ..........10

        5. Liberty Is Entitled to Injunctive Relief and Attorney's Fees...................12

II. CONCLUSION ................................................................................................13

# **TABLE OF AUTHORITIES**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013-1014 (9th Cir. 2001)...11

*Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124 (9th Cir. 2010) ......1

*Calder v. Jones*, 465 U.S. 783 (1984)....................................................................1

*Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991) .............5

*Columbia Pictures TV v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997)......................................................................................................1

*Elektra Entm't Group, Inc. v. Bryant*, 2004 U.S. Dist. LEXIS 26700 (C.D. Cal. Feb. 13, 2004) ...................................................................................................11

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 234, 97 L. Ed. 276, 73 S.Ct. 222 (1952).......................................................................................6, 11

*Hamil America, Inc. v. GFL, Inc.*, 193 F.3d 92 (2d Cir. 1999) ................................3

*Hickory Grove Music v. Andrews*, 749 F. Supp. 1001, 1003 (D. Mont. 1990).......12

*Int'l Korwin Corp. v. Kowalczyk*, 665 F. Supp. 652, 659 (N.D. Ill. 1987), *aff'd* 855 F. 2d 375 (N.D. Ill. 1987). ..................................................................................12

*Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 289 (2d Cir. 1999) .........................13

*Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998). ...........................................................................................................5

*Perfect 10, Inc. v. Talisman Communs., Inc.*, 2000 U.S. Dist. LEXIS 4564 (C.D. Cal. Mar. 27, 2000) ...........................................................................................11

*Righthaven LLC v. South Coast Partners, Inc.*, 2011 U.S. Dist. LEXIS 12802 (D. Nev. Feb. 5, 2011).................................................................................................1

*Superior Form Builders, Inc. v. Dan Chase Taxidermy Suppply Co.*, 74 F.3d 488, 496-97 (4th Cir. 1996) .......................................................................................5

*Van Halen Music v. Foos*, 728 F. Supp. 1495 (D. Mont. 1989)............................12

*Warner Bros. Ent, Inc. v. Duhy*, 2009 U.S. Dist. LEXIS 123332, 8-9 (C.D. Cal. Nov. 30, 2009) ..................................................................................................13

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108-109 (2d Cir. 2001) ..........3, 11

**Statutes**

17 U.S.C. § 502 ............................................................................................... 12

17 U.S.C. § 504 ................................................................................................. 5

17 U.S.C. § 505 ............................................................................................... 13

28 U.S.C. § 1391 ............................................................................................... 2

I. THE DEFAULT JUDGMENT SOUGHT AGAINST DEFENDANT MICHAELA HATANAKA IS APPROPRIATE

A. The Court has Jurisdiction over the Subject Matter and over the Defendant and Venue is Appropriate in this District

This Court has subject matter jurisdiction pursuant to the Copyright Act, (17 U.S.C. §§ 101 et seq.) and 28 U.S.C. §§ 1331 and 1338(a).

This Court has personal jurisdiction over the Defendant as she has committed tortious acts within this district.

Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims pleaded herein occurred in this district and because Defendant Michaela Hatanaka ("Hatanaka") resides and is found in this district.

B. The Facts of Record Show That a Default Judgment is Warranted

Plaintiff Liberty Media Holdings, LLC ("Liberty" or "Plaintiff") initiated this action against Doe Defendants 1 through 12 on April 20, 2011, seeking damages and injunctive relief for claims of copyright infringement. Doc #1.

On October 4, 2011, Plaintiff filed its First Amended Complaint identifying Defendant Hatanaka as the defendant previously identified as Doe Defendant no. 1 who, together with other identified doe defendants, is responsible for copyright infringement. Doc # 39.

On October 12, 2011, Defendant Hatanaka was personally served with the First Amended Complaint and Summons. Doc # 43.

As Hatanaka never answered or filed a responsive pleading to the First Amended Complaint, Plaintiff filed on November 30, 2011, a request that the Clerk enter Hatanaka's default. Doc # 60.

Default was entered as to Defendant Hatanaka on December 1, 2011.  Doc # 61.

Since Hatanaka has defaulted, all allegations in the Complaint are deemed to be true, at least with respect to her, and default judgment should be entered.

    C.    <u>The Specific Relief Sought by Plaintiff Is Factually Supported and Authorized by Law</u>

This Motion for Default Judgment is based on the allegations of the First Amended Complaint.  Doc # 39.  Hatanaka has admitted all of the facts therein by failing to respond.

    1.    Hatanaka Pirated Plaintiff's Works for Commercial Gain

Liberty owns copyrights for the cinematographic work "Down on the Farm" and has registered this work with the United States Copyright Office resulting in Certificate of Registration no. PA1-698-357.  Doc # 39-1.

Hatanaka used an online media distribution system (BitTorrent) to distribute at least one of the Plaintiff's works—"Down on the Farm"—to the public and/or make the work available for distribution to others, infringing on the Plaintiff's copyrights and exclusive rights under the Copyright Act.  Doc # 39 ¶¶ 17-18 and 60-66.

It is settled that, "to prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) the ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108-109 (2d Cir. 2001); *Hamil America, Inc. v. GFL, Inc.*, 193 F.3d 92 (2d Cir. 1999).  These facts are absolutely clear: Plaintiff Liberty is a well-established company with a long reputation for producing videos with exceptional production values and numerous awards for its works.  Liberty uses high-quality cameras and state-of-the art editing and reproduction equipment.  Liberty is a

socially responsible company that produces a high-quality product under a premium brand. Liberty's works are distributed throughout the world on DVDs and over the Internet on a website where its members pay a monthly fee for authorized access to Liberty's works.

This form of infringement, euphemistically called "file sharing," is not altruistic. It is profit-driven and motivated by greed, malice, and a conscious desire to steal from legitimate media producers. Declaration of Erika Dillon ¶ 33 (hereinafter "Dillon Dec."); Exhibit I at 13 (initial seeders have "financial incentives for posting these contents on BitTorrent"). The seeders are motivated by profit and use the trackers, download speeds, and protocols to provide incentives for users like Hatanaka to distribute works for the user's personal gain.

Hatanaka's infringement was willful and malicious. Doc. # 39 ¶ 64. Hatanaka's acts were for profit. This profit was not in the form of actual cash payments, but in the form of trade – with the barter providing more stolen copyrighted works. BitTorrent clients reward users for making content available to others by enabling faster download speeds for those who make content available. Users who merely download files, without publishing and sharing files, are derisively called "leechers." Being a leecher is not only a negative due to the pejorative terminology, but leechers are also punished by BitTorrent's protocol. Dillon Dec. ¶ 23-28; Exhibit "C" at 2 ("If you are not uploading at an acceptable rate, a tracker may limit and slow your access to part of the file that you still need to download."); Exhibit "E" ("Setting upload to '0' will get you disconnected from more and more peers … seeding well while downloading does improve your download."); Exhibit "F" at 6 ("If you're being stingy with the uploads, other clients won't transfer to you."). The protocol stalls the downloads of leechers, in an effort to preserve network speed for the more prolific copyright infringers. Dillon Dec. ¶ 24. BitTorrent protocol users even go so far as to attempt to figure out

methods by which it would be possible to charge leechers for their non-contribution. Exhibit "G". The sharing of files as users receive them, then, is inherent in BitTorrent's use for the protocol to be of any utility to the end user. Dillon Dec. ¶ 23.

Defendant was neither authorized to duplicate nor distribute the Plaintiff's copyrighted works. Dillon Dec. ¶ 12. See also Declaration of Brian Dunlap ¶ 11 (hereinafter "Dunlap Dec.").

Moreover, uploading and sharing content using BitTorrent requires technical knowledge and does not happen by accident. Doc # 39 ¶ 33 et seq.; Dillon Dec. ¶ 13.

Liberty's ability to sell DVDs and membership to its website is directly dependent upon its ability to control the distribution of its works. Dunlap Dec. ¶ 5-6. Simply put, Liberty cannot sell its movies when those same movies are available freely on the Internet and when copyright thieves such as Ms. Hatanaka steal the Plaintiff's works, using them as currency for the trade of other stolen works. *Id.* ¶ 7-10. A virtual black market of stolen works imperils dozens of lawful businesses, including the Plaintiff, and further imperils the very mandate of Article I, § 8, c. 8 (Copyright Clause).

### 2. Statutory Damages Are Authorized

The Copyright Act provides for a plaintiff to recover, at its election, either (1) its actual damages and (to the extent not redundant) defendant's profits attributable to infringement, or (2) statutory damages. 17 U.S.C. § 504. Either basis supports far more than the amount Plaintiff Liberty seeks in this motion – $25,000.

Because actual damages are often hard to prove, statutory damages have been authorized to make such proof unnecessary. *Chi-Boy Music v. Charlie Club,*

*Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991). Statutory damages serve both compensatory and punitive purposes, and thus may be appropriate "whether or not there is adequate evidence of the actual damages suffered by plaintiff or of the profits reaped by defendant" in order to effectuate the statutory policy of discouraging infringement. *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998). There is no way to determine how much additional infringement resulted from Hatanaka's actions.

Where registered works are infringed, as occurred here, the Copyright Act authorizes statutory damages. 17 U.S.C. §504(c). Where, as here, infringement is "willful," the amount may be as high as $150,000 for each infringed work. *Id.* Congress increased the maximum from $100,000 to $150,000 because it found large awards to be necessary and desirable to deter the great temptation to infringement posed by modern computer technology. H.R. Rep. No. 106-216 (1999), pp.6-7. The critical purpose of deterring similar misconduct permits a maximum per work award for willful infringement, even where the infringement caused little to no damage. *Superior Form Builders, Inc. v. Dan Chase Taxidermy Suppply Co.*, 74 F.3d 488, 496-97 (4th Cir. 1996) (collecting authority and sustaining maximum awards despite no proof of actual damages); *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 234, 97 L. Ed. 276, 73 S.Ct. 222 (1952) (for willful infringement a maximum award is permissible "even for uninjurious and unprofitable invasions").

On-line piracy is one of the greatest threats Liberty, and the entertainment industry as a whole, presently faces. Dunlap Dec. ¶ 9. When determining damages for a defendant's willful acts, the Court should consider the extent of piracy and infringement taking place on the Internet, (particularly in the arena of adult entertainment) and the need for deterrence thereof. Lawfully produced adult

works created within the confines and protections of the First Amendment are legally entitled to the same copyright protection as any other creative work.

### 3. Use of BitTorrent shows Willfulness

The BitTorrent file transfer protocol is used to locate, reproduce, and distribute infringing content. While there are legitimate uses for the BitTorrent software, it is impossible to accidentally upload or download files. Dillon Dec. ¶ 31, 13.

In order to access and use the BitTorrent file transfer protocol, a user must first download special BitTorrent software. Dillon Dec. ¶ 17.

It is helpful to think of the process of "torrenting" in the context of a constructed puzzle. In furtherance of sharing this puzzle, it is deconstructed into tiny pieces. Exhibit C at 2. These pieces are then uploaded and distributed among one or more peers. When an infringer seeks to download the original file, he downloads a torrent file containing information concerning where each of the distributed pieces of the file can be found, i.e., how to find and contact each peer. Each torrent file that contains information about the same original file is contains the same "hash" value, which is a string of letters and numbers that uniquely identifies the original file that the torrent file may be used to locate and download. Dillon Dec. ¶ 19. This torrent file is capable of locating all the unique corresponding pieces that make up the original file (and any additional copies of each piece that may be available). Once all the pieces are located and downloaded they are reconstructed back into the original order completing the entire original copyrighted file. *Id.* ¶ 21.

When users all possess the same infringing work with the same exact hash value, it is because each infringer possesses an <u>exact</u> digital copy, containing the exact bits unique to that version of the original work. In essence, although hundreds of users may be uploading the copyrighted work, you will receive only

6

the exact parts of a singular upload, not a compilation of available pieces from various uploads. *Id*. ¶ 20; see also Exhibit C at 4-5.

BitTorrent is a peer-to-peer file sharing protocol used for distributing and sharing data on the Internet, including files containing digital versions of motion pictures. Dillon Dec. ¶ 31. Rather than downloading a file from a single source, the BitTorrent protocol allows users to join a "swarm," or group, of hosts to download and upload from each other simultaneously. The process works as follows:

    a. First, users download a torrent file onto their computer. This file contains a unique hash code known as the SHA-1 hash – which is a unique identifier generated by a mathematical algorithm developed by the National Security Agency. This torrent file contains a "roadmap" to the IP addresses of other users who are sharing the media file identified by the unique hash value, as well as specifics about the media file. The media file could be any large file, such as a digital motion picture or music file.

    b. Second, the user opens the torrent file with a BitTorrent program, also known as a BitTorrent "client" application, which is capable of reading the roadmap encoded in the torrent file. This client program, after reading the roadmap, connects "uploaders" of the file (i.e. those that are distributing the content) with "downloaders" of the file (i.e. those that are copying the content). During this process, the client reaches out to one or more "trackers" that are identified on the roadmap. A tracker is an Internet server application that records the IP addresses associated with users who are currently sharing any number of media files identified by their unique hash values and then directs a BitTorrent user's computer

7

>     to other users who have the particular file each user is seeking to
>     download.

First Amended Complaint, Doc #39, ¶ 33.

For a BitTorrent user, this process is quite simple. When a BitTorrent user seeks to download a motion picture, he or she merely opens the appropriate torrent file, which may be found online on any number of torrent search engine websites, using a BitTorrent client application. *Id.* ¶ 34. Dillon Dec. ¶ 18.

Because BitTorrent client software generally lacks the ability to search for torrents, end-users use search engines or other websites that contain indices of torrent files to find files being made available by other BitTorrent users. These torrent files do not contain audio or visual media, but instruct the user's BitTorrent client where to go and how to obtain the desired file. Doc #39, ¶ 35; Dillon Dec. ¶ 18.

The downloading user's BitTorrent client then extracts a list containing one or more tracker locations, which it then uses to connect to at least one tracker that will identify IP addresses where the file is available. The downloading user's BitTorrent software then begins downloading the motion picture file without any further effort from the user, by communicating with the BitTorrent client programs running on the uploading users' computers. Doc #39, ¶ 36; Dillon Dec. ¶ 20.

The life cycle of a file shared using BitTorrent begins with just one individual – the initial propagator, sometimes called a "seed" user or "seeder." The initial propagator intentionally elects to share a file with a torrent swarm. The original file, in this case, contains Plaintiff's copyrighted motion picture. Doc #39, ¶ 37.

Other members of the swarm connect to the seed to download the file, wherein the download creates an exact digital copy of Plaintiff's copyrighted work on the downloaders' computers. As additional thieves request the same file, each additional thief joins the collective swarm, and each new thief receives the same or

8

different pieces of the file from each other thief in the swarm who has already downloaded any part of the file. Doc # 39, ¶ 38; Dillon Dec. ¶ 20. Eventually, once the initial propagator has distributed each piece of the file to at least one other thief, so that together the pieces downloaded by members of the swarm comprises the whole motion picture when reassembled, the initial propagator may leave the swarm, and the remaining thieves can still obtain a full copy of the motion picture by exchanging the pieces of the motion picture that each one has. *Ibid*.

  Files downloaded in this method are received in hundreds or even thousands of individual pieces. Each piece that is downloaded is immediately thereafter made available for distribution to other users seeking the same complete file. The effect of this technology makes every downloader also an uploader of the content. This means that every user who has a copy of the infringing material in a swarm may also be a source for later downloaders of that material. Doc # 39, ¶ 39; Dillon Dec. ¶ 20.

  This distributed nature of BitTorrent leads to a rapid viral sharing of a file throughout the collective peer users. As more peers join the collective swarm, the frequency of successful downloads also increases. Because of the nature of BitTorrent protocol, any seed peer that has downloaded a file prior to the time that a subsequent peer downloads the same file is automatically a source for the subsequent peer, so long as that first peer is online at the time the subsequent peer requests download of the file from the swarm. Dillon Dec. ¶ 20. Because of the nature of the collective swarm downloads as articulated above, every infringer is – and by necessity together – simultaneously both stealing the Plaintiff's copyrighted material and redistributing it. Doc # 39, ¶ 43.

  Plaintiff recorded an IP address used by Hatanaka being used to publish the Motion Picture via BitTorrent. Doc #39, ¶¶ 17 & 18. On that basis, Hatanaka was accused of the infringement. Doc # 39 ¶ 63. Hatanaka did not deny any of the accusations, and thus they are deemed to have been admitted.

Hatanaka published the Plaintiff's copyrighted motion picture to the BitTorrent network and distributed the work to others. Doc # 39 ¶ 63.

The transfer of infringing files cannot occur without the existence and assistance of the participant users, including Hatanaka.

Hatanaka downloaded a BitTorrent client for the purpose of conspiring with other BitTorrent users to reproduce and distribute movies in violation of copyright laws.

At the time Hatanaka downloaded a BitTorrent client, Hatanaka knew the client would provide access to infringing movies made available by other users and would allow the Defendant to provide infringing movies to other BitTorrent users. Dillon Dec. ¶ 32.

At the time Hatanaka downloaded a BitTorrent client, Hatanaka intended to access a network of other BitTorrent users for the purpose of reproducing and exchanging infringing copies of movies in violation of copyright laws.

Hatanaka, without authorization, offered infringing content to others for download, knowing the infringing nature of the content offered.

### 4. $25,000 in Statutory Damages Should Be Awarded In This Case

An enhanced award is appropriate in this case. The infringements here were willful and malicious. Hatanaka knew her conduct was unlawful, and she acted without the slightest pretense of a justification. To deter others from yielding to the same temptation, a large award is appropriate. *Yurman,* 262 F.3d at 113-114.

The "statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." *F.W. Woolworth,* 344 U.S. at 233 (1952).

In *Perfect 10, Inc. v. Talisman Communs., Inc.*, 2000 U.S. Dist. LEXIS 4564 (C.D. Cal. Mar. 27, 2000), a magazine publisher sued a website for publishing

mere <u>photographs</u> on the Internet. Evaluating damages the Court wrote, "While it would be difficult to quantify Perfect 10's damages resulting from the infringement, it is clear that Perfect 10 has been severely damaged. The photographs have been distributed worldwide, in a form that is easy to download and easy to copy. A virtually unlimited number of copies can be made of the copyrighted photographs, as a result of [defendant's] infringement." *Perfect 10, Inc.*, 2000 U.S. Dist. LEXIS 4564 at 11. The Court went on to award the maximum statutory award for willful infringement ($100,000 per work at the time) for each infringed photograph. This $100,000 per photograph certainly demonstrates a legal basis for Liberty claiming that much per infringed work (if not more) with respect to its Motion Pictures. See also *Elektra Entm't Group, Inc. v. Bryant*, 2004 U.S. Dist. LEXIS 26700 (C.D. Cal. Feb. 13, 2004) ("When digital works are distributed via the internet, as in this case, every downloader who receives one of the copyrighted works from Defendant[s] is in turn capable of also transmitting perfect copies of the works. Accordingly, the process is potentially exponential rather than linear, threatening virtually unstoppable infringement of the copyright."), citing, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013-1014 (9th Cir. 2001). Accordingly, there is a sufficient analogy between these cases and the instant case.

It is appropriate that the Court use opportunities such as this to send a message of deterrence to would be infringers that, "it costs less to obey the copyright laws than to disobey them." *Int'l Korwin Corp. v. Kowalczyk*, 665 F. Supp. 652, 659 (N.D. Ill. 1987), *aff'd* 855 F. 2d 375 (N.D. Ill. 1987). The District Court in *Korwin* held that, "[t]o determine the amount of statutory damages the court should primarily focus upon two factors: the willfulness of the defendant's conduct, and the deterrent value of the sanction imposed," pointing out that "courts have repeatedly emphasized that defendants must not be able to sneer in the face of

11

copyright owners and copyright laws." *Id.* See also, *Hickory Grove Music v. Andrews*, 749 F. Supp. 1001, 1003 (D. Mont. 1990); *Van Halen Music v. Foos*, 728 F. Supp. 1495 (D. Mont. 1989).

Hatanaka willfully infringed upon at least one of Liberty's works. Without the benefit of discovery, it is unknown how many other works Defendant may have unlawfully copied and redistributed, nor how many copies were redistributed.

At the maximum statutory damage of $150,000 per work, statutory damages of $150,000 are appropriate. However, in lieu of this maximum damages award, and in order to render a more merciful judgment, Liberty proposes and requests that the Court award $25,000.

5. Liberty Is Entitled to Injunctive Relief and Attorney's Fees

Plaintiff Liberty has been damaged by Defendant's conduct, continues to be damaged by such conduct, and has no adequate remedy at law to compensate for all of the possible damages stemming from the Defendant's conduct. Doc #39 ¶ 66.

Therefore, Liberty also seeks an injunction against future similar misconduct by Hatanaka. 17 U.S.C. § 502(a) makes express that the Court may issue "final injunctions on such terms as it may deem just to prevent or restrain infringement of a copyright." Thus, such relief is authorized here by Hatanaka's conduct. The Court should issue an order that Hatanaka should purge all Liberty produced materials from any and all hard drives or other storage media or provide evidence that any he keeps were, indeed, lawfully obtained.

Pursuant to 17 U.S.C. § 505, the Court has discretion to award "the recovery of full costs and reasonable attorney fees" in cases of copyright infringement. An award of attorneys' fees is appropriate where there is a finding of willful infringement. See *Warner Bros. Ent, Inc. v. Duhy*, 2009 U.S. Dist. LEXIS 123332,

8-9 (C.D. Cal. Nov. 30, 2009), citing *Kepner-Tregoe, Inc. v. Vroom*, 186 F.3d 283, 289 (2d Cir. 1999) (finding a district court's award of attorneys' fees under Section 505 to be "justified based on the court's finding of willfulness and [ ] in line with the statutory goal of deterrence").

Accordingly, Plaintiff Liberty requests attorney's fees in an amount to be proven upon approval**.** However, as a matter of judicial economy, the Plaintiff will waive any right to an attorney's fees award if the amount of damages requested is granted, as Liberty believes that a $25,000 award will be sufficient.

II. CONCLUSION

For the reasons demonstrated above, and based on the supporting evidence, Plaintiff Liberty requests that a default judgment be entered against Defendant Hatanaka.

If this motion is not opposed, Liberty requests entry of the proposed Final Judgment on the basis of the papers. If, however, there is an opposition, Liberty requests such a hearing as the Court deems appropriate, and reserves the right to offer additional evidence at that time.

DATED: Honolulu, Hawaii, February 23, 2012.

> SETH M REISS, AAL, ALLLC
> RANDAZZA LEGAL GROUP
>
> */s/ Seth M. Reiss*
> SETH M. REISS
> MARC J. RANDAZZA
>
> Attorneys for Plaintiff
> LIBERTY MEDIA HOLDINGS, LLC